May it please the Court, Tiberius Davis, on behalf of defendants. In Trump v. Hawaii, the Supreme Court reversed this court and upheld a travel ban issued under 1182F because the statute provides broad discretion and deference to the President to suspend the entry of a class of aliens in the national interest. The President issued a similar proclamation here to suspend the entry of refugees because of the unprecedented surge of migration over the past four years. The President – despite that, the District Court issued a sweeping universal injunction banning all – completely enjoining this proclamation despite the Court's precedent in Trump v. Hawaii. A panel of this circuit stayed that decision and, after several clarifications, made clear that it did so because it was likely – the government was likely to succeed on the merits under Trump v. Hawaii. This panel should make the same conclusion. The District Court and plaintiffs argue that the proclamation is unlawful for two primary reasons. One, they argue that it is in contrast and contrary to the Refugee Act of 1980, and second, because it is permanent, not temporary, suspension. Both are wrong. On the Refugee Act, Trump v. Hawaii made clear and addressed this issue that the admission bar in 1182F sits on top of the INA and is an additional grant of inadmissibility. In fact, the Refugee Act itself acknowledges this. In subsection C3, as plaintiffs point out, Congress cross-references 1182 and the admissions bars there and excludes some of them from the refugee program, including the public charge. It notably does not exclude 1182F. So 1182F clearly still applies. And there's no conflict between the permanent procedures and processes laid out in the Refugee Act and the temporary suspension for a class of aliens in 1182. Those things work in harmony, and both of them exude deference to the executive. The Refugee Act allows the President to set an annual cap based on the national interest, which is the same basis and the same policy interest that the President must make for 1182F. And also, he's allowed to, in his discretion, enumerate what groups get the caps under the Refugee Act. So there's no conflict there, especially because the Refugee Act does not grant admission. It is still discretionary, and people can still be barred for admissions. This is also true for the follow-on and family admissions, which the statute itself says they get the same status, but they must be admissible. In Trump v. Hawaii, there was, I think, maybe a 12-page memorandum explaining the President's decision. Here, it's shorter. How much does the President say here to give deference to? Is it enough just to a few sentences? What's the line that we need to draw here? Yes, Your Honor. I think it's basically just to make a facially valid reason for it. In Thale, which is another case for the United States, I believe it was the Clinton administration, had a proclamation that was one sentence long, and the court upheld that. So I think as long as it's facially valid reason under the Mandela-Hawaii framework for the proclamation, which is the President more than did enough here, that suffices. There's been over 40 proclamations in the past, and none of them have been stripped down because they didn't provide enough reasoning or enough facial validity. Thale is sort of the prime example, as that was one sentence. So I think the President here made a finding that it was against the national interest because of the unprecedented surge of migration over the last four years and because of the burden that that placed on localities and on taxpayer funds. Now, the district court and plaintiffs say that that basically makes it indefinite, but that's not the case. The President is actively trying to reduce the burdens of the massive immigration over the last four years by reducing the numbers of admissions but also increasing enforcement on those who are already here. There is a point where that will lapse, but the Supreme Court made clear in Trump v. Hawaii that the President doesn't have to set a specific date or a specific timeline. There all they did was say as long as the vetting was met – yes, Your Honor? There it was about the vetting of foreign countries, and there was no bright-line rule of when that vetting was met. That would still be up to the secretaries and the President to sort of determine whether those conditions were met. And some of those countries still have not met those vetting requirements. There's a new proclamation for similar reasons. So those have been years where people from those countries, because their vetting situations have not been met, are still suspended. If we were to agree with you as to the lawfulness of the executive order, does that resolve the entire case? I think it does, Your Honor. I think if we resolve the lawfulness of the executive order, then all of the sort of implementation follows along with that for the APA claims. There's no additional APA claims that are available here? I don't think so, Your Honor. I think they're all valid if they're implementations of the proclamation. And I think for the funding, it's perfectly within the authority of the Secretary of State and the President to cancel funding if there are no new people being admitted. And I think the statute allows for that. Now, the EO covers admission. It doesn't cover processing or application. And the Supreme Court for a long time has drawn a distinction between, for example, the granting of visas and the granting of admission. So the question of admissibility is different from the different from eligibility for admission. So the Refugee Act provides a very, very detailed set of instructions about how we designate refugees and how we ultimately admit them. So for example, you have, I think I'm using your statistics, but there's something like 128,000 people that have been classified as refugees. But under President Biden's prior determination for fiscal year 2025, only 125,000 of those could be admitted if all were to be admitted. So that means that there's a difference immediately between those who are eligible to be refugees and those who are going to be admitted. The EO and the 1182F deals with entry or admissions only. It doesn't deal with applications or refugee status. I think that those two things, while distinct, are closely related because if you get the status for a visa, for example, the whole point of getting the visa or to get refugee status is to get admitted. And if you can't get admitted, there's not really much of a remedy. The EO applies for how long? The EO applies until the President determines that the burden on the nation and localities from the unprecedented surge in migration over the last 30 years is –  Will he have to – will he have to reissue this every year? I don't believe he'll have to reissue it every year. But he does have a 90-day reporting requirement. Every 90 days – So he's going to review this every 90 days? Correct. Okay. One of those – Why wouldn't we continue to process refugees against the possibility that the President in 90 days will reauthorize it? And if you – if the President has no intention of reauthorizing it, then why would we consider that to be a cancellation of the refugee program? Well, I think there are a lot of inefficiencies in continuing the processing if these people can't get admitted. Certain things like medical checks and background checks have to happen close in time to admittance. So if the Department of State is required to do those far ahead of time when they don't know that the suspension will end or not, that's just essentially wasted resources on both behalf of the refugees and the government. So I think it's well within the State Department's discretion, which carries out these sort of admissions and background checks, to say we're going to pause those in light of the proclamation and the suspension. And once that is lifted, then we can reissue it. The process for obtaining refugee status, the record seems to indicate, can take many, many years. There are stories of it taking three or four years. If we stop that process, then we've got people that are now backed up another three years, don't we? So if you stop all processing right now, then once it is restarted, whether that's in this administration or a future administration, it's another three years out for the processing of these people. So why wouldn't we want these people to be processed now against the possibility that this administration or a future administration would resume the program? Well, I think each year it depends on what cap the president sets for who can get admitted and how they enumerate them. So the composition of who these refugees are is going to change every year and could still be subject to the suspension for some time. So it makes sense for the State Department to say, given the suspension, given that we're about to come up to a new cap under a new administration, to put a pause on that. And as you mentioned, there's about 128,000 people who already qualify who might meet that cap next year. And so processing more people that aren't going to be admitted for possibly years either due to the cap or the suspension is inefficient, and I think it's well within the State Department's discretion to say we don't have to do that. The EO also admits of the possibility of case-by-case. So how do we do that if we're not processing people? How do we even know that whether we might want to admit somebody on a case-by-case basis? Well, as you mentioned, there are already people who have gone through the process and could be admitted. But then we would only do case-by-cases only for those who are currently in the process? I think it could be broader than that, and I think that there are individuals who would  But if it's going to be broader than that, how do we do that if we're not processing them? I think people can get exemptions if there is a case that is raised to the Secretary of State and the Secretary of Homeland Security and the President, and then they can start the processing. So that – there's nothing to prevent them from then starting the processing if a case-by-case exemption has been given. And I also think, like, this isn't a total termination of grant, because the President's already given exemptions to a couple groups. So this is an ongoing process, and again, every 90 days, which is much faster than the 180 days in Trump v. Hawaii, the President is getting a report from the Secretary of Homeland Security and State to reevaluate it, and he's actively taking steps to help fix the problem that caused the proclamation to be issued in the first place. And plaintiffs say that while that seems indefinite, it's sort of up to the President to determine whether that's ever met or not. But the same thing could be said of Trump v. Hawaii, which was based on the vetting of – in foreign countries. And there's not a bright-line rule that a court could look at and say, okay, this country has met the vetting requirements, so you have to exempt them. Do we have arrangements with foreign countries to take refugees? I believe so. Okay, so if we were declaring people to be refugee status even though we had set a cap of zero, there's still the possibility that other countries might be taking those folks as refugees. So why would we stop the processing? I think those other countries could take refugees if they wanted to, regardless of what we were doing. I think my question to you, which I thought you answered yes, maybe you answered too quickly, was don't we have arrangements with other countries that will take people that we have declared to be refugees? I'm not sure about the precise contours of those arrangements, but again, there are still people that they can take that are currently processed as refugees. And even if that's the case, I don't think that takes away from the fact that the State Department has discretion in this process. And for the various policy reasons that they've laid out, including the current suspension, they're – they think it's inefficient to do that. The State Department has discretion not to process – not to process people? Again, that's not the EO, because the EO only applies to entry. Right, but this is the implementation of it. And I do think that they do have discretion not to do some of the processing, especially given that some of these people have to do background checks, medical checks. They're very close in time to when they're admitted. But the promise of your argument appears to be that this is, in fact, going to be a lasting bar on entry, on admission, and yet the argument started with your emphasis how this was temporary and could be changed. I mean, if it's – those are two different things. Your Honor, I don't think there's a conflict there. We don't know when the proclamation will end. That's up to the President. Well, if we don't know when the proclamation will end, what's the justification for stopping the processing for people who, at least in theory, in six months, the door may be opened again, but since nobody has been processed, nobody will actually be standing in line. Well, there – And that's the question that Judge Bivey posed, and I'm kind of still waiting for an answer. Well, Judge Clifton, I think there are already about 128,000 people who have been processed, and they'll be waiting in line. And whatever the new cap is, that will probably – I don't know what the cap will be, but that number is even higher than the Biden administration's cap. So there will be people in line who can be admitted. And once the suspension from the proclamation is lifted, new people can go through the process, and so they'll just get added to that queue of people. You just told us that some of this check has to be done close in time. Yeah. And if processing has stopped and there's been no processing for six-plus months, then will we satisfy that requirement? I assume that once the suspension is lifted, the sort of 128,000 people can then do those checks fairly fast. Again, they have to be close in time regardless. I'm still waiting for an explanation as to why processing should stop completely. The State Department, in its discretion, believes that it's inefficient to – given the suspension and the upcoming cap – to start processing a bunch of people who won't have any chance of getting in until the President's return is back. Counsel, you know, you've got 128,000 people. You have a cap of 125. So even if we admitted 125 for FY 2025, there will be 3,000 people that have been classified as refugees who are not going to get in. Somebody's going to have to make some decisions about what the priorities are. And so to follow up on Judge Clifton's point, if you're not processing people, the only people who've got priority are the people that have already been processed by the Biden administration and nobody else. Your Honor, frankly, I think that's a policy determination for the President and the State Department to make. Did they make that policy determination? Yeah, that they think that they should suspend admissions policies right now. Well, yes, but the President did suspend entry. Entry is different from the process of classifying people as refugees. This is a very, very old distinction well established in the cases. It's established in the statutes. Again, Your Honor, I think they're closely related for the fact that if you can't get admitted, the status doesn't really do anything. Like if you have a visa for work, but you can't get admitted to the country, that doesn't really mean anything. And I think this also gets to the irreparable harm of the fact that this takes years and years for this process to come out sometimes. And that even if these people get the status, that doesn't mean that they get entry for a number of admissibility bars and a lot of discretion is built in. And so I don't think there's irreparable harm from the processing or the proclamation itself because these people aren't assured entry, which is really what they're trying to get and it's really the benefit of the entire process. I'd like you to turn to the question of those who have already been admitted as refugees and what appears to be the cancellation of funding for the organizations, the cooperative agreements that would provide services to refugees in the United States. Okay. Can you address why we are not still providing services to refugees in the United States? So the one individual plaintiff who did bring that claim has been given the funds that he was requesting. But the reason for it is that the State Department and the President determined that it didn't make sense to continue providing funds when no new refugees would be admitted. Are there – I mean, there's a memorandum for the most part of admissions since January. Are there refugees who have been admitted who are eligible for refugee resettlement services? Well, there is the one individual plaintiff who has been given the status. Maybe some of the ones for the carve-out could be. But again, this is not a complete termination of all of the grants for this fiscal year. A lot of the money has already gone out throughout the year and the government has committed to paying for any work that's already been done. It's just terminated individual grants going forward, and one of those grants has not actually been terminated. And with respect to that statute, AUC 1522, is that – are the funds – is it mandatory? Does the government have to spend that money, or is it discretionary in your view? Your Honor, our reading of the statute is that it's discretionary. The title of the chapter is authorizations, and if you go to subsection B, which is all about the resettlement, it says that the director, or in this case the Secretary, is authorized to expropriate funds for these various means and through grants, cooperative agreements, and other processes. Now, plaintiffs point to the fact that there are a number of requirements under that, but those are requirements that exist if the grants are chosen to give out. So, you know, the Secretary can't just give out grants for any reason whatsoever. So, if he chooses to give out grants – So, can the Secretary decide not to – not to provide medical assistance and employment assistance and housing and other things under – under 1522? Yes, Your Honor, that is our understanding of the statute. Then you say you've got into the United States, good luck. Yeah, that is allowed because it authorizes the Secretary to make these decisions, to make these funding choices. Plus, this is the – No. I'm not sure that reconciles with the language at the very beginning of that section, which says the director shall, not might, not in its discretion can decide to, but take a look at 1522A1A. And shall, I mean, Justice Scalia's book tells us it's a mandatory word. We've got a congressional act which says this is what the government should do, what the director of the ORR should do. Where does that give the government discretion to decide, ah, we don't want to do it anyway? I think a couple of responses to that, Judge Clifton. First, the entire section, the entire chapter is called authorizations, and the Secretary is authorized to give out funds to the extent that it's appropriated. And if you look to subsection B, not subsection A, which is about these resettlement funds that are generally at issue, that does say that the director or the Secretary is authorized to make funds, authorized to enter grants and cooperative agreements for these purposes. And so we do – But you do not negate the word shall. Well, I think for the purposes of the resettlement, it does. It makes clear that this entire chapter is about the discretion that is given to the Secretary. And I think also in one of the Texas cases, the Supreme Court says shall when there's inherent sort of discretion baked in. It doesn't actually always mean shall. So for example, in Lincoln v. Virgil, the Supreme Court made clear that when there was a lump sum appropriation like here, that's given to the discretion of the agency. And the agency here has a pure discretion over whether to give it. And I just want to make clear that this was not a termination of all of the funds for the entire year. Quite a bit of money has already gone out for this fiscal year for these grants. Right, but I'm trying to figure out. So the statute has a 36-month sort of cap on things. The regs and other things have 90-day provisions that go to various requirements. I'm trying to figure out have all of the refugees in the United States already received the things that they were told that 1522 requires the Secretary to provide? I know that the individual names plaintiff has. I'm not sure about the people who have been admitted since under the carve out from the state panel. Okay, but how about people who were admitted in early January? Do we have other people who've been admitted on the case-by-case basis? There have been people admitted from the exemptions, and I'm not entirely sure whether they've gotten all this. But again, I don't think it's mandatory. And so... You think that they... Go ahead, Judge. You told us there were people admitted before January 20th. The order, the executive order doesn't apply, doesn't toss them back out. You told us that services already provided were paid for. What happened to the services that were promised and the statute appears to guarantee to those people? Has anything been done to provide those services? Again, Your Honor, our understanding of the statute is that it's not required. I agree for a moment that my understanding isn't the same as yours, that shall mean shall. So you're acknowledging, I take it, that in fact, they did not provide services to the people who were lawfully admitted prior to January 20th, regardless of whatever the statute says. I am not sure that those individuals were all given the funds, but as far as standing in this case goes, the PI here was based on a single named plaintiff who has been given all the funds. So I think that that issue would be moot as far as this PI is concerned. And again, I think Lincoln... Well, we do have a class that's been certified, right? We have three classes. I'm going to disagree with you respectfully on that, Judge Pidey, because the class certification didn't occur until long after this PI was already granted, so the PI is not based on the class. And once the PI is on appeal, the court lost jurisdiction to modify or change anything about the PI. So that class is not before us. Now, on remand, if this court decides to reverse the PI, we can have that debate and we obviously disagree with the class certification, but that's not at issue in this case. And so that can't be a basis for the PI that the district court issued here and it's on appeal. Can you address the Tucker Act issue on the jurisdictional issue? I understand the argument with respect to the nonprofit organizations that you cite, California versus the Department of Education and the recent NIH. But with respect to the individual refugees, how does the Tucker Act apply? Yeah, I do think it is arguably different for the individual plaintiffs because they're not sort of seeking money from a terminated contract or breach. So I think that really turns on whether they have an APA claim, which we don't believe that there is a discrete policy that they can challenge. The only thing that's happened here is the termination of a bunch of individual grants. And plaintiffs acknowledge that under the grants and the regulations themselves, the government was completely capable of terminating all of them. They include the ability to be terminated for changes in policy, which the government provided notice and made clear given the proclamation that there was a change in the government's policy. I also, again, reiterate that we don't think that the statute is mandated. But assuming that the statute does mandate it, we still don't think that's reviewable under the APA because under Lincoln versus Virgil, when Congress gives a lump sum appropriation, that's committed to agency discretion and that's not something that's easily reviewable. And I also think that essentially what plaintiffs are doing here with their APA claims are saying all of these different decisions and actions by the federal government amount to shutting down the refugee program, and they're challenging that. Under NTEU versus Vought, which is a recent D.C. Circuit case dealing with similar issues, there the plaintiffs tried to get around a lot of these issues by challenging what they saw as the shutdown of CFPB, and the D.C. Circuit said, no, what you're doing is a programmatic attack. You're taking all of these distinct actions, you're putting them together, you're saying if that's a final agency action, then you're trying to reform the entire system. That is under Norton, or under Lujan 1, an impermissible programmatic attack, which is what we also think is going on here. So again, I think there are a number of problems with the APA claims. I think there are, and if the proclamation is valid, I think a lot of these things fall away anyways because they're essentially carrying out the policies of that proclamation. Are there claims that you think have to go over to the Court of Federal Claims? The organizational plaintiffs' claims for the termination of the program. And why do they have to take over there? You said you've already paid for all of the services they've provided in the past. In the past, yes. So what would be the claim that they would take? That they're entitled to specific performance for continued payments. I didn't think that the CFC could grant specific performance. That's inequitable. Well, they can grant future funds, and I think this argument was made in the Department of Education. This argument was made in the NIH case that the Supreme Court both stayed. These are cooperative agreements. They're not contracts. Well, Your Honor, I don't, I mean, it would be a little bit strange if somebody with cooperative agreements therefore had more rights to bring equitable suits than somebody with a contract with the government. But I do think that these people can probably bring suits in the Court of Federal Claims if they have some sort of right under the cooperative agreements. I mean, the Federal Circuit and the Court of Federal Claims have been very, very clear that cooperative agreements are not contracts and cannot be enforced under the Tucker Act, that the only way that they can be enforced is APA and that they don't have jurisdiction over that. And I think it's rather odd that because these are cooperative agreements, they would have APA claims that people with contracts or grants would not have. Right, but they don't have, they do not have a contractual right. If they had contractual rights, they actually would be much, much more specific and would be beneficial for them. That might put them into the Court of Federal Claims, but so they have less protection because these are cooperative agreements, but that is a consequence of the way that Congress has structured this and that the Secretary of State decided to proceed by, not by contract, which the statute authorized him to do, but by cooperative agreements, which are much more like grants. But I guess two things. One, I think given the remedy that plaintiffs are asking for and what the district court actually ordered was essentially contractual relief, giving them the funds that they thought that they were due under the terminated agreement. If that's what is actually going on here, I think that should go to the Court of Federal Claims. And if that's not allowed under cooperative agreements, then I don't think they should have gotten that remedy in the first place. The second point I would like to make is plaintiffs themselves acknowledge that these cooperative agreements can be terminated essentially at will by the government, and that's what the government did here. So I don't really understand what their APA claim is or what the remedy would be. What are they vacating? Are they vacating the terminations of their grants? There's no other sort of policy other than the termination of these individual grants. And again, some of the money has already been paid out in the past. They're paying out for work done. And there's one grant that has not been terminated. So I don't know what final agency action or policy they're challenging under the APA other than the termination of their individual non-cooperative agreements, which they admit can be terminated at will for changes in policies, which is exactly what happened here. So for that reason, I don't think they have APA claims either. Could the individual refugees go to the Court of Federal Claims and try to enforce the cooperative agreements as essentially third-party beneficiaries? I don't think they would have standing for that. I think that they have to sort of bring the APA claims, but again, they – I mean, as a general contract principle, third-party beneficiaries can enforce contracts even if they're not a party to the contract, right? Yes. Sometimes they can. Although it's – it's a part of the contract and it references them and it's for their benefit. Right. I mean, it's a bit weird here when you have cooperative agreements and it's for like a class of people and an individual goes and says, you know, these terminated cooperative agreements were meant to benefit me. And especially when the government has discretion over who they enter with the cooperative agreements and discretion to terminate them, it's a little bit odd to think that that would end up there. But again, like that is a possibility, I suppose. I know you're way over time. I may give you an extra three minutes, but before I do, does Judge Bybee or Clifton have any questions? Okay. Great. Thank you. Good morning, Your Honors. May it please the Court. My name is Linda Everts. I'm appearing on behalf of plaintiff Appellees and I will be splitting the argument today with my colleague, Melissa Keeney. I'm planning to address the merits and Ms. Keeney is planning to address the balance of equities and the scope of relief. Your Honors, the Supreme Court in Hawaii specifically contemplated limits on the President's exercise of his 1182-F authority, including that the President cannot override a statute such as the Refugee Act. Shutting down a program mandated by Congress within hours of inauguration cannot satisfy those limits. The Refugee Act was a landmark piece of legislation. As Your Honors have already noted, it was extremely detailed, the work of a decade, and intended, among other things, to put into place this country's treaty obligation. Congress declared in the Act that it is the policy of the United States to respond to the urgent needs of persecuted people. And the Act has two main objectives, one, to provide a permanent and systematic procedure for admitting refugees of special humanitarian concern to the United States, and two, to provide comprehensive and uniform provisions for the effective resettlement of those admitted refugees. The Executive Order overrides the Refugee Act and flips Congress's scheme on its head. It functionally makes the status of being a refugee into a ground of inadmissibility because refugees are categorically barred as a group. And this conflicts in various ways with the Refugee Act. For one, as has already come up in a questioning of government counsel, the Refugee Act specifically says in its codification in 1522A1A that to the extent of available appropriations, certain services shall be provided to refugees, and those include, among others, as judged by be noted, that they shall be provided with assistance in order to become – to find jobs and to have English-language training. And – Let's turn back to the relationship between 1182F and the Refugee Act. So 1182 does give the President authority, and the court in Hawaii recognized that. Why can't the President suspend this? I mean, this is – the little bit of a double-edged sword here is that the government wants to rely on the 90-day review to show that the program is temporary and not permanent. You want to emphasize that it's gone to zero in terms of admissions, and with the cancellation of the program and everything else, that looks pretty permanent. Yes, Your Honor. And just to be clear, we have two distinct arguments which are independently sufficient grounds to affirm the district court's preliminary injunction. One is the idea that this is not a suspension as authorized under 1182F because it's not a suspension for a period. It is functionally an indefinite suspension. And the reason for that is clear just on the face of the executive order, and that's because among the policy interests that President Trump says motivate that order are preserving U.S. taxpayer dollars for U.S. citizens. But because the Refugee Act specifically requires that taxpayer funding be used to resettle refugees in this country, it is impossible to admit refugees and not use taxpayer dollars for them. And so that is why there is an irreconcilable conflict between the executive order on the one hand – As you just said, it's going to be reviewed every 90 days. But if it's reviewed every 90 days with that policy in mind, then there's still an irreconcilable conflict. And every 90 days, it will continue to be the case that refugees are contrary to the U.S. interest, according to President Trump. The President has the authority to set the cap each year. What if the President set the cap at 25? Your Honor, obviously, it would be a – what I will say is that it is clear that the President cannot set the cap. The President has the authority to set the cap at zero, and that's because that would be directly contrary to Congress's system to have a permanent and systematic way for admitting refugees into this country and providing for them once a year. It simply would not be the policy – And so how would that be contrary? How would that violate the act? Doesn't the President get to set the limit? The President does get to set the limit, but the idea is that it cannot be the case that we have a permanent system for refugee admissions if the President can simply say there will be no refugees admitted to this country. Well, if he has to do it, he has to renew it every year in Congress. If Congress doesn't like it, they can come back and set the limit themselves, they can hold congressional hearings, they can impeach the President. There's a lot of different remedies that Congress might have. But if they're going to tell the President that he can set the limit, it's – by statute, it's capped at 125. Is that right? Is the statute – No, by statute, it's – President Biden set the limit last year at 125, but there's no limit in the statute as to how high the cap can go if that's the position. And there's no – and there's nothing in the statute that tells you how low it can go. There's no – That is also correct, Your Honor. The floor. So if the President set it at 25, tell me why that violates the act. I think it's difficult to say what specific number, and so I – that's why I was talking about why the President can't set zero. But I do want to go back to what you said just a moment ago, Judge Bidey. So if the President – okay, but if you – now I hear you – that you're backing off. It seems to me that you're admitting the President could set it at 25. Clearly, there will be people who will disagree with it, but apparently, and by law, the President could set it at 25. If he sets it at 25, that has a whole bunch of other consequences. One thing I would note, Judge Bidey, is that in addition to Congress making clear what its purpose was in creating the act and what its policy was to admit refugees, it's also that it had other statutory purposes, including ensuring family unity. And you can see that in various provisions of the Refugee Act, and those provisions directly go to the idea that refugees who are already here shall be able to bring their immediate family members, their children, and their spouses here. And so if the refugee cap was set at 25, it would make it impossible for those individuals to unite with their families. Congress has said that. That's also true as to the 3,000 who have been granted refugee status but can't be admitted under President Biden's limit of 125,000. Somebody's going to be left out here. There's 128,000 who have had, according to government statistics, who have refugee status approved. But under President Biden's cap, that's 125,000. That's a difference of 3,000. Somebody's going to get left out here, even under a very generous reading of the statute. But I just want to make clear, Judge Bidey, that when you look at what Congress intended, it's a system that is in place year upon year upon year that's designed to be permanent. And so even if someone were not able to enter this particular year, the expectation would be that they'd be able to be admitted in the future. And as Your Honor noted in the questioning of the government, processing tends to take years. And so it would be anticipated that someone might not be admitted this year but certainly could be admitted in a future year, as long as processing were to continue. What if in other countries, foreign countries, there's an epidemic of Ebola, COVID, monkey pox, all rolled into one, and the President says, invoking 1182F, I'm not going to let any refugees into the United States because I don't want potential diseases, deadly communicable diseases to come to the United States. Does the President still have power to do that, or does the Refugee Act override it and the President still has to admit refugees in? Just to be clear, Judge Lee, in this hypothetical, the entire – the pandemic exists in the entire world, and so the idea that refugees from anywhere in the world – Yeah, well, we don't know. It's in other parts of the world, and the President says, I'm going to limit the number of refugees coming to the United States to zero because I don't want this disease to come into the United States. Does the President still have to, because there's a cap, still have to allow people in? I mean, certainly I think it would depend – it's hard to say without thinking about specific findings and additional explanation in the process, obviously, that is required under the Refugee Act. But what I would say is that at a minimum, it seems extraordinarily different than what we have here, which is the President saying that there is a policy interest that is categorically opposed to the idea of having refugees as provided for under Congress's act. I would note just one fact that I want to point that report to, which is that in another way in which the President's executive order conflicts with the act is that in – Congress has already thought about this idea of refugees and other similar populations heavily impacting certain areas of the country. And I'm pointing you now to 1522AQC1. And so Congress thought about that idea, and it said there will be areas that are heavily impacted by refugees in similar populations. And when that happens, the answer is not to bar refugees entirely from the country, but rather that the entities that are resettling refugees and deciding on their placements – and that includes resettlement agencies referred to as local agencies there, voluntary agencies – that they just – they need to, in general, place people in areas that are not heavily impacted in the United States, except, I would note, when there is immediate family in a heavily impacted area. And then the refugee is still resettled in that heavily impacted area. And I note all this because it's clear that President Trump – Congress has stepped into this space, just like Hawaii talks about, thought about this problem, and come to a conclusion, and it has drawn a line. And now President Trump is stepping into this space and wiping all of that away. I just don't see how the judiciary has any role in enforcing that. Those lines are not so specific that we are in a position to second-guess the President or the Secretary of State in the admission of this. And 1182F does give the President the power to suspend it. MS.  Your Honor –   The question of cancellation raises a whole bunch of questions that I dealt with with the government, which I'd like to get to. But I don't see how the President doesn't have authority to suspend this or how he doesn't have the authority next year in – for FY2026 to declare that only 25 people would be admitted. It may be awful policy, but it doesn't strike me that it's unlawful. MS. The only additional conflict that I would point your Honor to is, as I mentioned before, Congress has specifically intended the Refugee Act to replace the ad hoc executive decision-making with respect to refugees that had existed before, and to ensure not only that there was planning, year-by-year planning, and also that it was systematic, but also that there was heavy consultation with Congress. If you look at the consultation requirements in 1187F – And can we enforce the – did the President not consult with Congress? MS. Well, in the executive order, there's no indication that he has, but – Okay. But is that something that we get to enforce? We get to strike the executive order because we think that the President didn't consult with Congress or he didn't consult in good faith? MS. But what is the purpose of the unjusticiable counsel? MS. Your Honor, my point is simply that Congress wanted to be involved in this process. It wanted to be involved both in consultation in the subject matter that the President had to think about in terms of which refugees to admit and how many to admit, and it has that heavily detailed procedure that's unique in the INA, if not in law, as to what the President and his administration have to do. But I think – What in subsection F reflects the limitations you say we should infer from other portions of the statute? MS. I mean, they could have written into subsection F, for example, exclusion for family members that you talk about are protected elsewhere, but I don't see anything like that in subsection F. I don't see subsection F requiring approval of Congress or consultation or anything else. So how is it – I mean, the fact that there is potentially a statutory mandate to provide assistance in resettlement does distinguish this case, I think, from many others, but I don't see how that speaks to the particular problem that's been teed up right now, which is the President's authority to suspend entry. What can we turn to to apply a limiting principle to that authority? MS. Your Honor, the last thing I would say on this, and then I'm happy to turn to the EPA claims, is just that, as we pointed out in our briefing and as this Court has pointed out in Hawaii v. Trump, the vacated opinion that had to do with the second executive order that had a refugee ban included in it, a later in time and more specific statute under traditional canons of statutory interpretation controls. And so it seems clear in this case that Congress thought about this, and it specifically wanted there to be a specific refugee program that had these consultation requirements that ensured that refugees were both admitted and that they received resettlement benefits once they got here. But I see that my time is rapidly going, so if there are no more questions on this, then I will pivot to the plaintiff's EPA claim. Even if this Court were to determine that the refugee ban is lawful, the agencies, as we pointed out in our briefing, did much more than what the executive order required, and their actions were unlawful. So, for example, it's clear under what is required of agencies that they must act reasonably and reasonably explain their actions. At the threshold, as the District Court found, the agencies have not reasonably explained their actions at all, and in addition, their actions are not reasonable. So as Judge Baiby and I was asking before, there are a variety of ways in which it's clear that the agency's actions here directly conflict with the Refugee Act, perhaps most notably going to 1522 for a moment, so A1A says that the agencies shall, to the extent of available appropriations, provide certain assistance to refugees who are admitted to this country, and of course, all of that language in that entire section is designed to implement one of the two main objectives of the Act, which is to provide effective resettlement What assistance is not being provided? Well, at this point in time, the assistance that's being provided is being provided because of the court's injunction, to the extent that it remains in effect, and the government hasn't sought to state a second injunction, but that assistance would generally be for the first 90 days of a refugee being in the United States, the assurance of support from a local organization, and that assurance would include setting up housing, getting food in the refrigerator, making sure that kids are enrolled in school, helping the adults to find jobs, which is a... Sorry to interrupt. It's been more than 90 days since January when this moratorium was put into place. Are there any eligible refugees who've been admitted who would still be eligible for the resettlement services? Yes, and not just refugees. So the government talked only about one named plaintiff, but of course, this action is now a class action, and it's one of the classes that was certified on behalf of all refugees who have been or will be admitted within 90 days, the initial resettlement benefits that they would be entitled to in their first 90 days. Are those people already admitted to the United States, or they're asking to be admitted? So there are people who were admitted because of the court's injunction, the portion that has remained operative after the panel stayed partially the injunction, and so those individuals continue to be entitled to services, but... How many people are there? I think there are approximately 80 who have been admitted as a result of that, but I would also note, Your Honor... So that class is a class of 80. These are largely the Afghani refugees? Not entirely, no. Largely. I'm sorry? Largely. Some of them are from Afghanistan, but there are people from other parts of the world as well. But in addition to that, as we pointed out, Congress has also provided that our Afghan and Iraqi allies who have come through the Special Immigrant Visa Program, they are entitled to reception and placement benefits to the same extent as refugees. They have been continuing to arrive. Nothing has happened to that program, and they have not been able to get their benefits in the same way that they would have otherwise. We've heard that they are trying to sign up for benefits when they arrive, told that there are two... So are the Afghani and Iraqi refugees arriving under that program, are they not subject to this ban? Or is this covered by the injunction? I'm not talking about refugees right now. I'm talking about a different pathway. This is the Special Immigrant Visa pathway. And so it's not refugees, but Congress has provided that this group of people is entitled to benefits to the same extent as refugees. Okay. I'm really confused. Are they involved in this lawsuit? Yes, they are, and they are part of the certified class for reception and placement benefits. Okay. Are they receiving benefits? So our understanding is that they are not receiving benefits in the way that they otherwise would, and they have to get on wait lists and are often turned away. Okay. And would they be entitled to benefits? Where does the 90-day thing come from? The statute refers to three years. Where does the 90 days come from? So if you look at 1522B, that's talking about initial resettlement benefits. It's referred to as the reception and placement program. So that's the first 90 days, and it's a critical 90 days when very basic benefits are provided that set up the effective resettlement that Congress demanded in the statute. And then after that, there are other programs to which refugees are entitled that are administered by ORR. And is that what the three years applies to? That's right. That's what's happening over the duration of the three years. Okay. So are these folks receiving anything under these programs, either the initial 90-day assistance or the more extensive programs? Just to back up for a moment, Judge Bivey, because I think this is motivating your question, what the agencies did was they terminated overnight all of the reception and placement contracts. So but for the court's injunctions, there would no longer be a reception and placement program. It would be entirely gone. And so if the court had not enjoined that action, no one would be receiving benefits, not the refugees who have been arriving under the operative portion of the program. So the only reason that those benefits are available right now to any extent is because of the district court's injunction. To your knowledge, is anything being provided to them now? Once we issued our administrative stay, what happened? Well, I believe the administrative stay, it stopped refugees from being admitted, but it had no impact on the special immigrant visa admission because it's a separate program. What happened to the funding to the organizations that were providing the services? Was it completely stopped? And we were told by the government, maybe I've misunderstood some things. We were told by the government that they'd been paid for the services already rendered. But that doesn't tell me what's happened to the people who were, for whatever reason, admitted at any time, even before January 20th, who were still in the process of resettlement process. It could be three years, so forth. What's happened to the funding for those programs? So I believe, Judge Clifton, what you're getting at is just that the government says that past payments have been provided, but that's not actually what's at issue here. We're talking about the policy to get rid of initial reception and placement benefits going forward and in the future. And that obviously harms refugees, as well as Afghan and Iraqi allies who'd be entitled to those benefits, as well as the resettlement agencies who have been doing this work for collectively more than 100 years. Well, this really gets to the question, what has happened with those groups since, not just January 20th, I guess, since the issuance of the termination of the funding of the programs? Has the funding stopped for the people that were already in the pipeline of being resettled? Well, yes, the funding would have stopped for the people who were already in the pipeline. So reception and placement benefits would no longer be available to someone who was in the United States who had been resettled, but for the district court's injunction, which the government never sought to stay, the second injunction that dealt with funding termination specifically. So now we're dealing, we're off the emergency motion, we're on to the merits of the case. I take it you are arguing that the district court's injunction should be affirmed with regard to the funding of those programs. That's correct. Does the law require that those programs be funded? I mean, the Secretary is committed to provide certain kinds of services. He may do that by cooperative agreements. So the services have to be provided. That may be done through cooperative agreements, but that doesn't mean the Secretary has to do it through cooperative agreements. The Secretary presumably could just provide for this himself. It hasn't, that hasn't been done that way. Yes, and, Your Honor, so I think there are a couple of different things happening. One is that the statute actually does provide that resettlement agencies will be involved in the placement decisions and the planning for resettled refugees. And so I would point, Your Honor, to 15, 22, A2, A and B. It says the Secretary shall meet with regularly, no less than quarterly, resettlement agencies. It uses the term voluntary agencies as well as states and localities. And then we'll also plan with them. So there's no way to cut them out of the process entirely. Can you address this? Because obviously, your friend on the other side has a different view of the statute. He says 15, 22 is discretionary and points to 15, 22 B, C, which says the Director is authorized to spend money and we generally view as discretionary. And then you point to 15, 22 A, which uses the word shall, which is typically mandatory. So how do we reconcile 15, 22 A, which has shall with 15, 22 B, C and D that uses the word authorized? So I think the issue here, Judge Lee, is that it is clear that there is a statutory obligation under the Refugee Act to provide assistance to refugees. It's one of the objectives of the Act and that was codified in 15, 22. There's no way around that. And that is what the District Court found. With respect to Section D7, it says that the Secretary may enter into cooperative agreements with resettlement agencies. And of course, it has always done so for the last 50 years. But what the District Court held and what we have argued throughout is not that there's never a circumstance in which the Secretary can terminate a cooperative agreement as long as they do so according to law. But the issue here is that by terminating en masse overnight all of the cooperative agreements for reception and placement benefits, the government made it impossible for them to meet their obligations to provide for the effective resettlement. Okay. So this is not a – I don't see that there's any right here that belongs to the organizations. They've provided marvelous service in the past. They got terminated very, very quickly. But I don't see that they've got any – I don't see that they've got a contract. They're under a cooperative agreement that has a different legal status and they can be terminated at will. What it does create, though, is a problem for the refugees who do have a statutory right to certain kinds of resettlement benefits. Those can be provided by a cooperative through a cooperative agreement with those agencies, but the Secretary is under an obligation to see that they are in some way. Now, maybe that means the State Department sends its own employees out to help people prepare resumes and drive their kids to school. But I don't see that – I don't see that that's a right – I see that that's a right belonging to the refugees under 1522, but not to the organizations. And Judge Frege, I think that's right, and that's exactly what the district court held. But based on the unrebutted factual record and the concessions of defendants in this case, the court found that there was no way for the government to meet its statutory obligations to individual refugees without the agreements that were currently made. And that suggests that the actions were arbitrary and capricious. Arbitrary and capricious, contrary to law. Contrary to law, but I guess – there's nothing in the law that requires the Secretary to enter into cooperative agreements. That's correct. It's just simply that the Secretary will have then failed to do so and it's probably arbitrary and capricious for him to have terminated these contracts without making other provisions for the refugees. That's exactly – and the defendants have never argued, although given many opportunities, how they could possibly meet their obligations now, today, as they were required to do, without the cooperative agreements in place. And that's specifically what the district court found, and it found that they do have the right to terminate agreements as long as they meet their legal obligations. He's very clear on that point. What do we do with processing outside of the country for people who are seeking refugee status? Judge Briby, as you noted, and I believe there were various other questions on this issue, if Your Honors were to conclude that the executive order is lawful because it is suspension within the meaning of 1182F and it doesn't conflict with law, by terminating the cooperative agreements for processing abroad, it makes it absolutely impossible to resume refugee case processing at any time in the near future. And so it is effectively just getting rigged. And so in your view, you would – if you thought – if we were to hold – you would like us to see us hold – let me ask this differently, let me make it more open. What is it you want us to hold on that – on that? What is it you want us to say? Assume that – assume for purposes of my question that I think that the EO is constitutional. It's within 1182, okay? So what if the government's position is, hey, we're not going to be admitting anybody. Why should we be processing people? This is an empty act. It gives them false promises. It wastes our money. It wastes everybody's time in processing that. So tell me what it is that you think needs to – should happen here, assuming that the executive order is constitutional. So there are, of course, three different ways in which we have argued that the government's action is – violates the APA, and only one of them is arbitrary and capricious. But I would say that – a couple of different points. So one is that, as your honor has already pointed out, if the processing were to stop, then that would mean that all of these refugees, many of whom have case processing that will need to last for years, are just stopped in place, and they cannot come to the United States for a significant period of time because their cases have been stopped. But in addition, something that did not come up is that all of the operational apparatus will be eviscerated. It won't exist anymore. And so that's yet another reason why there is no reasonable expectation that this processing could resume any time in the near future. And with respect to the reception and placement program, recall that people come to the United That's how Congress designed the scheme. And so you need to have an assurance from a resettlement agency or other that someone is going to be providing you with those basic benefits. Right. But anybody who's – who will be applying for refugee status in the future, if our court were to hold that the EO is constitutional, will understand that, in fact, nobody is being allowed into the United States under the refugee program, that it's been paused. But I'm – but my question is, then why should we be – why should we continue to process applications for refugee status? So, Your Honor, a couple of reasons. I mean, so one, it is contrary to law to that – to Congress's idea to have a permanent and systematic procedure for admitting refugees, even if they're not being admitted today, if the agencies can just get rid of all of that processing and make it impossible for refugees to be admitted in the future. That is an action that the agencies are taking. They're making it impossible to comply with Congress's scheme. They don't have that authority. Number two, it is arbitrary and capricious for a variety of reasons, among them that the agencies haven't considered the reliance interests of the refugees who have been in processing for them for many years. I got the – I got the reliance interest question.  So for people that we are processing, are there other avenues other than coming to the United States that applying for refugee status in the United States would serve? Are any of these people being admitted, for example, to another country under some kind of a cooperative arrangement with the United States? I would actually note, Your Honor, that my understanding is that once a person has been placed into the U.S. pipeline, so the U.S. refugee admissions pipeline, they are then not able to be in other countries' pipelines. So actually, it's the case that all of these people who have been in processing sometimes for years, sometimes on the verge of travel to the United States, now can't come here and don't have another option precisely because they relied on the system that Congress had created that was designed to be permanent and systematic. MR GOLDBERG. Let me pose a hypothetical. It's partly triggered by real life. I know there was a proposal by the United States to the country of Palau, which I'm Suppose the United States struck an agreement with Palau that people in line to be admitted to the United States as refugees were instead sent to Palau by the agreement of the Palau government. How would that affect our argument? MS. GOLDBERG. Well, I think it would be an evisceration of the scheme that Congress intended and an evisceration done by administrative agencies, because Congress said that it wanted refugees to be coming here to the United States, that it was designed to respond to the urgent needs of persecuted people in part by admitting refugees here to the United States and resettling them here.   Well, that's something that the United States has power to do. But in terms of the need of the refugee, I mean, heaven knows if you're on this court, we deal with asylum claims all the time. And if the point of seeking asylum, the point of being a refugee is to get out of a situation that is, we have defined as intolerable and unacceptable. If you get out, but you don't get to go to the United States, you get to go to Palau, how does that not satisfy the requirements imposed or adopted by Congress in the Refugee Act? Well, I would point your honor to the idea of family unity that's embedded into the Refugee Act that I was talking about earlier and how Congress specifically provided that when principal refugees have been resettled to this country, that they're able to apply for their young children and spouses to come as well, their minor children and spouses. And Congress has privileged that as well as one of the highest priorities of the Refugee Act. And so of course, if minor children and spouses were unable to rejoin their family members here, that would be contrary to the Refugee Act. So I want to make sure that I understand the answer. So if we were to tell the government that while it can ban entry, it can't eviscerate the Refugee Act by prohibiting people from continuing to apply for refugee status, the only consequence of that would be that we would have a large pool of people that we had approved as refugees against some future date when another administration decided to lift the ban and say, yes, we're now admitting refugees once again. But in the meantime, it would also have the consequence of perhaps prohibiting those people from pursuing other opportunities to go to other countries as refugees. Did I state that correctly? A couple of thoughts, Your Honor. So one is that it would allow people to continue to be processed here. And for some people, this is the only option because they're reuniting with family who is here. And so they are waiting for the day when that suspension would be lifted. But in addition, it would preserve the infrastructure that has existed and that is necessary for the U.S. refugee admissions program to operate. So without the processing centers that have been operated, for example, by some of our clients in this case, the organizational plaintiffs, there would be no processing. And of course, also it would preserve the infrastructure in the United States, the reception and placement program. And as I mentioned before, that infrastructure is serving both refugees on the one hand and also special immigrant visa entrants from our Afghan and Iraqi allies. I see that I am well over my time, and I want to make sure that my colleague has time as well. Great. Thank you. Good morning, Your Honors. Melissa Keene for the Plaintiffs Appellees. May it please the Court. I wanted to start with arguments that defendants made today about the class certification and that that cannot justify the scope of the injunctions here. And that's simply wrong. The fact that the class was certified after the injunction was issued is not unprecedented. In fact, it happens in fast-moving cases such as this one. The court in Doe No. 1 v. Trump addressed a very similar situation. There, the class was provisionally certified after the injunction was issued, and the court wrote, quote, the scope of the injunction is appropriate at this juncture, regardless of whether or not it was when it was originally issued. And that's at 1069 of the opinion. So certainly, CASA supports the idea that a universal injunction can be justified by class-wide relief. And here we have a class, and there's no reason for the court to ignore that fact. I also wanted to address some of the arguments that defendants made about irreparable harm. Here, the district court made extensive factual findings about the irreparable harms facing the plaintiffs. We have, of course, refugees facing danger, families who are indefinitely separated, loss of critical services for those who've been resettled, including initial housing and other such services, and the organizations which have spent decades building the infrastructure and the expertise to execute their faith-based missions to help resettle refugees. All of this is at risk. And today, defendants, they suggested that there is no irreparable harm because refugees are not guaranteed admission. But that is beside the point, because, of course, plaintiffs don't argue that defendants certainly have discretion on whether or not to grant or deny admission in any individual case. But what plaintiffs challenge here is the categorical bar to their entry and to their processing, which certainly is causing devastating and irreparable harms at this time. Your Honors mentioned the administrative stay that's in place, and I did want to address that, because it has, of course, prevented the orders from this court and the district court from taking effect for more than a month. And it is urgent that this court lift that administrative stay, as well as the other orders from the motions panel, just given the significant and compounding irreparable harms that those orders are inflicting on the plaintiffs. I've had trouble figuring out how many people were talking about with regard to the motion panel orders. I've heard 80, and I've heard 160, and I think I understand where those come from. How many more people would we be talking about if the order entered by the district court seeking to effectuate the motions panel order? How many people would we be talking about that would need to be screened and so forth? Under the motions panel's latest order and the district court's order, we're talking about a little over 12,000 individuals, but that's really only a little over 4,000 refugee families. The parties agree that as to the reliance interest determination that the motions panel required, that it would be on a family basis rather than an individual one. But we would submit that the court should, if the court wants to retain some part of the stay, and that it should be limited to the individuals who had travel booked that was then canceled, but without the case-by-case reliance determinations. Because in these cases, the reliance interests are self-evident, and there's no reason for the court to require individual reliance determination. Okay. So your answer to Judge Clifton is, is it going to be 12,000, or is it going to be something smaller than that? It's about a little over 12,000 individuals. And the 12,000 people are people who have already been approved, yet granted refugee status by the United States, and they have travel documents, or they did not have travel documents? They had travel scheduled. The way it works for refugees is they're not given travel documents until the moment of travel. So IOM schedules travel once a refugee has completed all processing and has been approved. And so this group of individuals had completed all those processing steps, had their travel arranged, and then their travel was abruptly canceled as a result of the executive order.  So these 12,000 people, these people did have travel arranged. They just didn't have the – they didn't have what? The ticket in hand? Refugees don't get a ticket in hand until they arrive at the airport. So take, for example, Plaintiff Placito, our lead plaintiff. He had travel arranged for January 22nd. He arrived at the transit center, and that's where they hand over their bags. They are prepared and brought to the airport, and that's when they would then receive their tickets. These 12,000 people, did they all have a date on which they knew they were to go to the  Yes, they did, Your Honor. And how far in the future were – for these 12,000 people, how far in the future was that travel arranged? I mean, was it arranged – was it all in January? Was it all in February? Was some of it in March? Was some of it in June? The government figures show that as much as 90 percent of the cases where travel was scheduled, that travel was scheduled to take place within a few weeks of the suspension, so largely in February. And this is from one of the declarations that the government submitted in February. It's document 61.2. But first – and we also submitted declarations from individuals who had travel canceled, where their travel may have been booked further out. But for example, one of our declarants described that in Thailand, where he currently resides, there's a mandatory two-month period of detention before a refugee is permitted to leave. And so that travel was scheduled further out to accommodate that two-week mandatory detention period. So there are all sorts of reasons that travel may be booked further out, and it doesn't in any way mean that the refugee family wouldn't have taken steps to uproot their lives and move across the world and clearly had relied on that promise of travel and would have taken actions as a result of that. Your Honor, what is at stake are the lives of thousands of refugees for whom Congress devised a careful plan for their effective resettlement that's been in place for 50 years, with the organizational plaintiffs collectively spending more than 100 years working in partnership with the government to help welcome them into local communities. With one stroke of his pen, the President has elected to dismantle it all, causing overwhelming and irreparable harm to refugees dreaded abroad, their families who are awaiting reunification, and the states and localities that have planned for their arrival. Plaintiffs would respectfully request that this Court immediately lift the administrative stay and permit the district court's injunctions to take full effect. At minimum, the Court should preserve the injunctions for the individuals who had their travel arranged that would have been abruptly canceled. Are there no further questions? Thank you. Thank you, Your Honors. I'd just like to start briefly where my colleague ended, which is on the stays. We obviously believe the stays should be maintained until this Court reverses the preliminary injunction. The stay panel in this case has already said that the government is likely to succeed on that for a preliminary injunction. And on the administrative stay, as plaintiffs just pointed out, the number jumps from about 80 to 12,000 if you push out and do what the district court is trying to impose. In the clarification orders from the stay panel, they made clear that this was not supposed to swallow the stay, that they were just looking at people like Posido who were stranded in a transit place. And yet the district court issued a 23-page opinion saying that there are a bunch of rebuttable presumptions of people who obviously have reliance interests, and the government has to do six-page briefs in response to reject them in a very short timeline. It is unworkable, as this Court has said in the stay panels, that they did not expect this to be covering 12,000 people, and that's exactly what plaintiffs are asking for. And so we believe that's contrary to what's already been decided and is contrary to the likelihood of success on the merits here. Can you address Judge Bybee's suggestion that what's involved here are cooperative agreements, I guess, not procurement contracts, so they don't belong in the Court of Federal Claims? I mean, a similar issue arose, albeit a district court in D.C. I think it's the Catholic Bishop's case, which I guess assumed similar cooperative agreements belong in the Court of Federal Claims. I don't know if you've been involved in that case or the NIH or the California versus Department of Education. I don't know if you have a more global view. Can you respond to Judge Bybee's question on that? Yeah, I think it really depends on the type of remedy that they're asking for and the type of remedy that's being granted here. It's essentially to get the money paid out for these agreements, which is contractual in nature. I think otherwise that's – what they're seeking here doesn't make sense unless it goes through the Court of Federal Claims. That's what the Catholic Bishop case said. That would only apply – if your point is valid at all, it's only valid with respect to the organizational plaintiffs. It's not valid with respect to the refugees. Understood, Your Honor, and I'm talking about the organizational plaintiffs here. I think – Has the government proposed another way to provide services to the individuals? Well, Your Honor, so far, at least with the individual named plaintiff who's before the court, Ali, they have provided the services. And I think if we're talking about scope of injunction here, for the people who have been admitted, it is possible for the government to provide the services for those who have been admitted within the 90 days. But the district court went much further than that in violation of CASA and basically turned – Let me go – I mean, what I was trying to pose is that I never saw anything that suggested how the services would be provided but for the fact that the district court injunction requiring some provision. But it appeared that the orders issued by the departments said no more funding. Well, there's – So how would the services be provided? Well, I think they can still reengage with some of these groups to provide funding for individual refugees. I think given the injunction, that's essentially what's happened. And one of the grants hasn't been terminated. It hasn't been a blanket termination of every single grant. So I do think it's still possible to provide these if that's required. Again – You're saying provide enough funds for whatever – 80, 100, whatever the number is for those – Rather than turning on the entire – And it's your position, though, and I know they're also in a position that under the statute that these are discretionary, so the government could just refuse to provide the  But if they decide to, then it would be just for the 80 to whatever the number may be. Correct, Judge Lee. I think two points. We read the statute as authorizing, so that's discretionary. This is lump sum appropriation. So under Lincoln v. Virgil, we think that's committed to agency discretion. And Judge Bybee, to your point, that there are a lot of ways that the Secretary can choose to carry out these programs. I think that that just proves that this entire scheme is subject to agency discretion and not review of the 80. Sure. But to my colleague's questions, you don't have to just stop providing services. I quite disagree with the government on the fact that this is discretionary. That seems to be very, very clear in 1522. I just think you're wrong on that. So I'm going to telegraph my view on that one. Now, the Secretary can provide that himself if he wishes to. But you're probably going to have to provide some of these services. He's chosen to do it in the past through cooperative agreements. I don't, I'm not sure that these organizations have standing to come in and say it has to be us. But you're going to have to provide them. Now, I don't know how, I'm not sure how many people there are for this to be provided. You represented in one of the status reports that the government was soliciting additional proposals for cooperative agreements. What's the status of that? I don't know the current status of that. I think because of the injunction that there is services being provided, I believe that's what plaintiffs said that a lot of people... You told us in the status, I believe this is, well, it was several months ago that you expected that to be completed within three months. So as far as you know, nothing's been done. I don't, I don't think that's true. I do think some services have been provided, including... But you have not entered into an additional cooperative agreement, which is what you were representing to the district court in the status. I'm just unaware of the precise status of that, Your Honor. We may have. I just want to also take a step back to say that in about a month, the cap will be reset and there will be new funding. So a lot of this is going to change in that time. And that doesn't mean that this is permanent because they terminated the current cooperative agreements. There'll be different money allocated based on the different cap, probably taking into the 1182F suspension right now. And the president, contrary to what plaintiffs say, isn't just ignoring the Refugee Act consultation. There is consultation that is ongoing to make these sort of determinations. That is a process that's still going on. Also, contrary to what plaintiffs said, the processing is not just completely shut down and completely gone. Again, we're still doing the processing for the people that are in the carve-out and for people who have met the exemptions. So, you know, the regulations, that process, it doesn't just disappear because they've halted processing additional people who aren't subject to those exemptions. It's not just like it disappears. We have to restructure everything. The regulations still exist. The way of doing it still exists. They're still processing people right now for the refugees from Afghanistan and other places. So it's not that it's just completely gone and off the books. MR. GOTTLIEB Who's doing the processing? To the extent that the organizations are involved in some of it, has somebody been tasked with filling in? MR. BOUTROUS I think the State Department's officials are the ones who do the processing for refugee applicants before they arrive. And so that can continue. MR. GOTTLIEB Before they arrive?  BOUTROUS Right, before they arrive.  GOTTLIEB What happens after they arrive? MR. BOUTROUS I mean, I think to the extent the injunction and that there's still a cooperative agreement, those benefits exist.  GOTTLIEB And if we reversed the injunction on all bases, those cooperative agreements would all be canceled and no further services would be provided to the refugees who are in the United States.  BOUTROUS That would currently be the case if there was a full reversal, Your Honor, and we believe that that's required based on the statute in the APA. But yes, if that is a full reversal, that would be the result. I also just want to point out that on the discussion of 1182-F, there was a lot of discussion of policies but not a lot of discussion of the text. If you look at subsection C-3 of the Refugee Act, Congress knew about the admissibility bars in 1182. It cross-referenced them. It explicitly excluded some, like the public charge, from being a bar for refugees. It did not exclude 1182-F. Congress knows about it. They understood that this was an additional temporary ability of the President to suspend. And the fact that the Refugee Act has a lot of detailed regulations and laws and rules about how refugees are admitted doesn't take that out of 1182-F. That's true of many, many visas, but there have been over 40 proclamations under 1182-F over many presidents that have dealt with suspending visas, including visas for students from China, that also have very detailed regulations, very detailed statutes. The fact that there's a detailed congressional statute does not mean that 1182-F does not apply. And finally, I just want to talk a little bit about the actual plaintiffs are here in response to the class action point. The government completely disagrees. The plaintiffs that are before this Court are the ones that were at issue and that the PI was granted for and that we took on appeal. Once we took that PI on appeal, the district court lost its jurisdiction to modify or change anything about that PI. The plaintiffs that exist, one of them, Ali, is the only individual plaintiff with the issues with the resettlement funding here. That's moot. He's been paid out. The only ones with the family issue is Esther and Josephine. They've been admitted, so that's moot. But even so, plaintiffs ignore the fact that the statute on family admittance says that they also have to be admissible separately. So the 1182-F bar still applies. And as Your Honor, Judge Bybee pointed out, the cap sometimes doesn't allow family members to get in. That's why some of these people were waiting for years and years. So with respect to the class certification, if we thought that the class certification was a nullity and if the government didn't win everything here, then what would happen? I think we would remand. There would be an opportunity for the class certification and to figure out how that changes the issues where maybe there is a mootness problem or a lack of a plaintiff. So the district court would have to redo all the class certification? The class certification is not on appeal, so I'm not sure about that. But I don't think this PI can stand based on the class certification. I don't think the scope of the PI – I don't think the party standing can justify this PI. That's sort of the point I'm making. Because if the class certification is not currently on appeal, he might have jurisdiction over that by itself. But it doesn't justify the PI that's before the court here. And talking about the Afghan and Iraqi group that aren't refugees, I don't believe that that was briefed or an issue in this PI. I think that's an issue with the class certification below, but I don't think that's an issue for this appeal. And so that's just sort of adding additional problems here. And as far as the reparable harm for the organizational plaintiffs, which we agree, Judge Feige, that we don't think they have standing. But the D.C. Circuit just yesterday came out with a case, Climate Fund versus Citibank, that dealt similarly with a bunch of grant terminations and an attempt by organizations to say, oh, this is an APA case because they're just shutting down these programs. And the D.C. Circuit said, no, you have to go through the Tucker Act. You have to go through the Court of Federal Claims because these are really contract claims. And to irreparable harm, the plaintiffs made very similar arguments to what they're making here, that we rely on these government funds. And without them, we're going to shut down. And the D.C. Circuit says, loss of money, loss of grant funds is typically not an irreparable harm. And the fact that you've decided to make your organization completely dependent on government largesse does not give you an irreparable harm. So we don't think there's an irreparable harm here either for- That case, like most of the others, seems different to the extent that unless we accept your position that 1522 is discretionary, and that doesn't seem like the most powerful position. If we don't accept that, then we do have a statutory mandate that says the government must provide some services. And that would seem to distinguish this case from the one you just cited or most of the other cases offered up to us. I think maybe that's true for the individual plaintiffs who get the benefits. I don't think that's true for the organizational plaintiffs. I think they're in the exact same boat, making the exact same arguments. And especially that's true for irreparable harm. Except we're back in the circle that we've touched on before, and I don't need to elaborate upon it. But if the government doesn't have another plan to provide services they're mandated to provide, what else are we left with? Again, Your Honor, I think that's committed to agency discretion, even if we accept that the statute sort of requires something, that something's up to the agency. Is the government offered up any way it's going to provide those services? I think currently, as Judge Biden pointed out, there are plans to reinitiate some of those cooperative agreements. I don't know where that process is, but I think there are a lot of options. But the problem with that is that suggests that the cooperative agreements in place are what they're going to lean on. So why do we disregard that? If they haven't offered an alternative, and we conclude they're required to provide these services to the individual plaintiffs, how are you going to do that without having the organizations involved? Well, Your Honor, I think if we get down the path of you disagree that the statute is discretionary, you disagree that there's any bars to the APA review, and you think there has to be some sort of ability to order the resources be issued. I think the way to do it is to do it by the individuals who are admitted in, just order that the government has to provide those resources. They've done so for the named plaintiff here. They can do so through cooperative agreements or otherwise going forward. But that doesn't justify the sweeping scope and violation of CASA that the district court did, which was just to turn on all the spigots again. And again, in 30 days, the funding and the cap is going to be reset. And so we're in a whole different world on what's possible then. And I think it's a bit premature to say that we need to return all the funding in this case because of an individual plaintiff. Are there any further questions? Great. Thank you. I think we've set a record for going over time, but it was very useful. Again, thank you for the excellent advocacy by everyone. The case has been submitted. We're adjourned. All rise. This court for this session stands adjourned.
judges: CLIFTON, BYBEE, LEE